# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CASE NO. 5:17-CR-49 (MTT) |
| | ) |
| GUSTAVO CONSTANZA and | ) |
| MILFRANDEL CEDANO, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ORDER

Defendants Gustavo Constanza and Milfrandel Cedano have moved to suppress evidence found in a vehicle in which Constanza was the passenger and Cedano was the driver. Docs. 32; 60.[1] For the following reasons, the motions are **DENIED**.

## I. FINDINGS OF FACT

The Court finds that the evidence admitted at the hearing on the Defendants' motions establishes the following facts by a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).[2]

On August 4, 2016, at approximately 11:45 am, Sergeant Anthony Thompson, Sergeant Jeremy Haire, and Thompson's drug-detection canine, Jazz, of the Lamar County Sheriff's Office were patrolling the southbound lanes of Interstate 75 in a marked patrol car. Docs. 41 at 1, 3; 64 at 14:9-14, 20:22. Thompson testified that while

---

[1] Constanza requested to adopt Cedano's motion to suppress (Doc. 32) and amended motion to suppress (Doc. 60), and the Court granted that request. Docs. 42; 61.

[2] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

driving, he saw a gold Jeep "cross over the yellow solid fog line located on [his] side of the roadway on several occasions."[3]  Doc. 64 at 14:13-19.  He "proceeded to get behind the vehicle and activated [his] emergency equipment to conduct a traffic stop."  *Id.*  According to Thompson, as soon as the emergency equipment is activated, a video recorder on the patrol car begins recording, though he did not realize until after the fact that there was no audio.  *Id.* at 14:2-8.  The video footage, which was admitted into evidence as "Government Exhibit 3" at the hearing, shows the Jeep pull over to the left shoulder of the interstate and come to a full stop.  Docs. 61-4 at 0:15-0:26; 64 at 25:3-21.  After running the vehicle's tag on the computer in his patrol car and informing Dispatch of the tag, Thompson approached the vehicle from the driver side, explained the reason for the stop to the driver, Cedano, and asked for his driver's license.  Doc. 64 at 34-45, 63:19-22, 65:3-6.  Thompson testified that as Cedano was handing his driver's license, Cedano's hand "was shaking terribly" and his "voice was starting to murmur or stutter."  Doc. 64 at 16:23-17:4.  Thompson then noticed at the top of Cedano's driver's license the words, "Limited Permit," in big bold letters.  *Id.* at 17:4-6.  When he asked

---

[3] Thompson's testimony seems to conflict with Haire's regarding when the traffic violation was first observed.  Though both testified that they first saw the Jeep drive by while the patrol car was stationary, Thompson said he observed a failure to maintain lane while traveling south on I-75 and Haire said he observed a failure to maintain lane while the car was still stationary.  *Compare* Doc. 64 at 33:24-34:14 *with* Doc. 64 at 85:18-24.  Constanza argues that this contradiction makes the traffic violation "incredible on its face."  Doc. 66 at 7.  Notwithstanding this apparent contradiction, after considering the officers' entire testimony and weighing their credibility, the Court finds that the officers observed the Jeep fail to maintain a lane on several occasions before making the traffic stop.  Constanza nevertheless argues that the "claim by both officers that several lane violations were observed between the time they pulled out into traffic and when the subject vehicle was stopped, is belied by simple common sense and reason" because by the time the Jeep passed the stationary patrol car, even had the patrol car accelerated at a very high rate of speed, it would have been impossible for the patrol car to, in less than two miles, catch up with the Jeep and then pull back all while observing several instances of lane violations.  *Id.*  Again, based on the officers' testimony and weighing their credibility, and notwithstanding any inconsistency in their recollections with regard to when each saw an improper lane change, the Court finds the Government has established that the officers had probable cause to conduct a traffic stop for failure to maintain lane.  Accordingly, the initial traffic stop was lawful.

Cedano to step out and come to the rear of the vehicle so that he could hear him better, Cedano complied and confirmed he had a limited permit. *Id.* at 17:7-18:15. Because Thompson knew, based on his experience and training, that a limited permit could only be used for work, school, or medical reasons, he asked several questions, including where Cedano was headed, to determine whether Cedano was in violation of his limited permit. *Id.* at 17:24-18:5, 18:1-3. Once Cedano told Thompson he was headed south so that the passenger, Constanza, could purchase a vehicle, Thompson concluded Cedano was in violation of his limited permit and decided the Defendants "were no longer free to go at that time."[4] *Id.* at 18:6-22, 43:4-13.

In the meantime, while Thompson was questioning Cedano, Haire approached the driver side of the vehicle to speak with Constanza. Doc. 61-4 at 1:10-1:40. Haire testified that Constanza provided his driver's license, which was later found to be suspended, and stated he and Cedano were traveling south so that Cedano could purchase a vehicle. Doc. 64 at 19:1-7, 82:3-13. Haire then joined Thompson and Cedano at the rear of the vehicle where Haire learned that Constanza's explanation of why they were traveling south contradicted Cedano's. Docs. 61-4 at 1:42-1:1:55; 64 at 82:14-21. Haire asked Cedano whether the vehicle belonged to him. Doc. 64 at 113:8-16. According to Haire, after Cedano replied "no" and stated he did not know who owned the vehicle, Cedano began "holding his own hands and hugging himself nervously."[5] *Id.* at 93:10-22, 113:8-114:6. Haire testified that Constanza also told him

---

[4] Thompson later testified that "[a]t no point were [the Defendants] free to go." Doc. 64 at 75:19. Thompson also testified, when cross examined, that he reached the conclusion that Cedano was in violation of his limited permit after he and Haire had "sp[o]ken to the passenger and everything else." *Id.* at 71:12-19.

[5] Thompson described this "hugging" behavior as Cedano "handcuffing himself," which, based on his training and experience, is a criminal indicator. Doc. 64 at 44:12-20. He also testified that he observed

the vehicle did not belong to him. *Id.* at 120:19-121:1. At this point, only about three minutes had elapsed since the officers approached the vehicle. Doc. 61-4 at 0:25-3:15.

Because of the inconsistent stories and the nervous behavior exhibited by the Defendants, Haire asked Cedano if there were any drugs in the vehicle. Doc. 64 at 82:22-83:5. Receiving no response, Haire asked if he could search the vehicle, to which Cedano replied, "No." *Id.* at 83:6-9.

At that point, about four minutes into the stop, Thompson, who also testified he observed "criminal indicators," such as stuttering of speech and lots of hand movement, deployed Jazz to conduct a free air sniff around the vehicle. Docs. 61-4 at 4:20; 64 at 75:9-11. Thompson walked Jazz around the vehicle and, approximately twenty-two seconds into Jazz's sniff, Jazz alerted, by sitting down, indicating drugs were inside the vehicle. Doc. 61-4 at 4:25-4:47. The officers then searched the vehicle and, within ten seconds, Haire found a brown paper bag containing suspected methamphetamine under the driver's seat, "just slightly tucked behind the driver's seat." Docs. 61-4 at 5:27-5:36; 64 at 83:19-21. The officers immediately placed the Defendants in handcuffs and arrested them. Doc. 61-4 at 5:35-5:56. Approximately five minutes had elapsed from the time the officers initiated the traffic stop to when the arrest was made. *Id.* at 0:25-5:35.

---

other criminal indicators, such as slurred speech or stuttering of speech and shaking of the hands. *Id.* at 45:16-18. The Court does not give great weight to suspicions based on "nervous indicators." *See United States v. Perkins*, 348 F.3d 965, 971 (11th Cir. 2003) (noting that nervousness is generally not a sufficient basis for prolonging a stop); *see also United States v. Tapia*, 912 F.2d 1367, 1371 (11th Cir. 1990) ("[B]eing Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates (not yet a crime in Alabama), do not provide a minimal, particularized basis for a conclusion of reasonable suspicion on the part of [the officer]."). Nobody is comfortable during an interstate traffic stop. But clearly the officers here had reasons to be suspicious apart from nervous indicators, including Cedano driving in violation of the limited permit and the Defendants providing inconsistent statements and not knowing the owner of the vehicle. Accordingly, the Court accepts that Cedano's and Constanza's behavior heightened these suspicions.

After making the arrest, Thompson ran the driver's and the passenger's information and contacted Dispatch. Doc. 64 at 22:24-23:12. When he learned from Dispatch that Cedano did in fact have a limited permit and that Constanza was wanted on a trafficking in methamphetamine charge, Thompson called for a tow truck. Doc. 64 at 76:10-19. According to Thompson, "if there is not another licensed driver that can take the vehicle at that time," it is their policy to do an inventory search before the vehicle is impounded by the wrecker. *Id.* at 23:19-24. There is no evidence that the Lamar County Sheriff's Office has a written policy or procedure for impounding vehicles and inventorying their contents. But pursuant to their "policy," the officers conducted an initial inventory search of the vehicle at the scene. *Id.* at 76:19-21. But because it was unsafe to conduct an inventory search while the vehicle was parked close to the traffic lanes and there was ongoing traffic, the vehicle was taken to the Sheriff's Office where Thompson and Lieutenant Chad Payne continued the inventory search. *Id.* at 24:3-9. Thompson testified that during the inventory search at the Sheriff's Office Lieutenant Payne told him he located a "trap"—a hidden compartment—at the rear of the vehicle. *Id.* at 24:11-14. Specifically, the trap was found behind a bumper, but the trap was discoverable without having to remove the bumper. *Id.* at 77:22-78:4. While there was nothing inside the hidden compartment, based on his training and experience, Thompson concluded that "traps" are "used by criminals to conceal criminal activity, whether it be narcotics, currency." *Id.* at 24:15-19, 78:9-11. On September 21, 2017, a grand jury indicted the Defendants with one count of possession with intent to distribute methamphetamine. Doc. 1.

## II. MOTION TO SUPPRESS STANDARD

The movant bears the initial burden of persuading the court, through specific factual allegations and supporting evidence, that the evidence should be suppressed. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). Once the movant establishes a basis for the motion, the burden then shifts to the Government to prove by a preponderance of the evidence that the search or seizure of evidence was legally and factually justified. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citation omitted) ("Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the [F]ourth [A]mendment."); *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (citation omitted) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

## III. DISCUSSION

In their motions to suppress, the Defendants argue that the search of the vehicle following a traffic stop violated their Fourth Amendment rights and, thus, the evidence seized from the search should be excluded under the exclusionary rule.[6] Docs. 32; 60.

---

[6] The Defendants also argue that the search and seizure violated their rights under the Fifth and Fourteenth Amendments because the Georgia statute, O.C.G.A. § 40-6-48(1), upon which the officers relied to stop the vehicle, is void for vagueness. Docs. 32 at 1; 60 at 2. This argument fails, however, because the officers' good-faith reliance on the statute's validity was objectively reasonable. *U.S. v. Steed*, 548 F.3d 961, 969 (11th Cir. 2008). Section 40-6-48(1) provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be removed from such lane until the driver has first ascertained that such movement can be made with safety." § 40-6-48(1). Contrary to the Defendants' assertion, nothing in the statute leads the Court to conclude that it is "clearly unconstitutional." Particularly given that the objective reasonableness of the officers' reliance on the

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures. U.S. Const. amend. IV. "Under the exclusionary rule, evidence obtained in an encounter that is in violation of the Fourth Amendment, including the direct products of police misconduct and evidence derived from the illegal conduct, or 'fruit of the poisonous tree,' cannot be used in a criminal trial against the victim of the illegal search and seizure." *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003) (citations omitted).

A seizure takes place "[w]henever a police officer accosts an individual and restrains his freedom to walk away." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Traffic stops "qualify as seizures under the Fourth Amendment." *United States v. Ramirez*, 476 F.3d 1231, 1236 (11th Cir. 2007). The Supreme Court in *Rodriguez v. United States* has observed that a "seizure for a traffic violation justifies a police investigation of that violation." 135 S.Ct. 1609, 1614 (2015). A routine traffic stop is "more analogous to a so-called *Terry* stop than to a formal arrest." *Id.* (quotation marks and citations omitted). Thus, the legality of these stops is analyzed under the standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), which requires an officer's investigation to be "reasonably related in scope to the circumstances which justified the interference in the first place." *Ramirez*, 476 F.3d at 1236 (quotation marks and citations omitted). In other words, like a *Terry* stop, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns."

---

statute is evaluated under a "reasonably well-trained officer" standard and not a "reasonable jurist" standard, the Court is satisfied that it was objectively reasonable for the officers, who are well-trained, to rely on the validity of the Georgia driving-on-roadway statute when initiating the traffic stop. *Steed*, 548 F.3d at 974.

*Rodriguez*, 135 S.Ct. at 1614 (citations omitted).  Apart from determining whether to issue a traffic citation, this mission includes "ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id.* at 1615 (alterations omitted).  Moreover, an officer may conduct certain unrelated checks during an otherwise lawful traffic stop, so long as he does not do so "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  *Id.*

**A.     Standing**

The Court raised sua sponte at the evidentiary hearing the issue of whether the Defendants have standing to contest the search of the vehicle and gave the parties an opportunity to submit supplemental briefs on this issue.[7]  Doc. 64 at 123:22-24, 128:16-129:12.  It is well-established that a defendant bears the burden of establishing his standing to assert a violation of the Fourth Amendment by a challenged search or seizure.  *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) ("The individual challenging a search bears the burden of proof and persuasion" on the issue of his standing).  To meet this burden, the defendant must show that he had a legitimate expectation of privacy in the area searched.  *Rakas*, 439 U.S. at 143; *United States v. Lee*, 586 F.3d 859, 864-65 (11th Cir. 2009) (citations omitted).  "Determining whether an individual has a legitimate

---

[7] At the hearing, counsel for Cedano requested additional time to determine whether further evidence was needed to show standing.  Doc. 64. at 124:6-20, 128:3-10.  That request, which went unopposed, was granted.  *Id.*  However, up to this point, Cedano has not offered any additional evidence.  Nor has Cedano submitted a supplemental brief on the issue of standing, though both the Government and Constanza have done so.  Docs. 65; 66.

expectation of privacy in the object of a search requires a two-part inquiry": (1) whether the individual manifested a subjective expectation of privacy in the property searched, and (2) whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable. *United States v. McBean*, 861 F.2d 1570, 1573 & n.7 (11th Cir. 1988). "A legitimate expectation of privacy [must] be proven by factors beyond mere possession, such as a right to exclude or a right to privacy." *United States v. Espinosa-Orlando*, 704 F.2d 507, 512 (11th Cir. 1983) (citations omitted).

Here, the Defendants do not argue they have a legitimate expectation of privacy in the vehicle, and they clearly do not. According to Haire, Cedano told him the vehicle was not his, and he did not know who the owner was. Doc. 64 at 113:8-19. Nor did the vehicle belong to Constanza, who, as a passenger, did not have an expectation of privacy in the vehicle. *United States v. Lee*, 586 F.3d 859, 864 (11th Cir. 2009) ("We have held that a passenger in a private car, who has no possessory interest in the automobile, does not have a legitimate expectation of privacy. . . .") (quotation marks, alterations, and citations omitted). Thus, the Defendants could not have manifested an expectation of privacy in a vehicle that did not belong to them and whose owner they could not identify. Accordingly, they lack standing to challenge the search directly.

However, Constanza argues in his supplemental brief that, because he has asserted a Fourth Amendment violation based on an unlawful detention, he has standing to challenge the fruits of the unlawful traffic stop. Doc. 66 at 5. The Government does not address this potential basis for the Defendants' standing. The Eleventh Circuit apparently has not addressed this issue, but other circuits have allowed passengers to seek suppression of evidence found in a vehicle as the fruit of an

unlawful detention.  *See, e.g.*, *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000); *see also United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) (holding that passengers have standing to challenge the fruits of an unlawful detention). Assuming, without deciding, that the Defendants have standing to seek suppression of the drugs as the fruits of an unlawful detention, the Court will address the legality of the traffic stop.[8]

**B.    Length and Scope of the Traffic Stop**

As mentioned, the Court finds as a matter of fact that the officers had probable cause to stop the vehicle for failure to maintain lane.  Thus, the initial traffic stop was lawful.  Notwithstanding, the Defendants argue they were unlawfully detained because the traffic stop "immediately turned into a drug investigation," which reveals the "ersatz traffic stop."  Docs. 32 at 4; 66 at 9.  According to the Defendants, the traffic stop was complete as soon as the stop turned into a drug investigation, and, thus, they contend any further police interaction, including the dog sniff, unreasonably prolonged the stop. *Id.*  Next, the Defendants argue that the officers needed but failed to possess either reasonable suspicion or the driver's consent to "extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose."  *Id.*

First, the Court concludes that the traffic stop was not yet complete when the dog sniff was conducted approximately four minutes into the stop.  During those four minutes, the officers discovered that (1) Cedano had only a limited permit; (2) he was in

---

[8] "Standing" here does not refer to the standing doctrine under Article III's "case or controversy" requirement; rather, it refers to a defendant's ability to challenge, under the Fourth Amendment, the constitutionality of a governmental action. *Compare Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (discussing Article III standing), *with United States v. Kimball*, 25 F.3d 1, 5 n.1 (1st Cir. 1994) (discussing Fourth Amendment standing).

violation of that permit; (3) the Defendants' accounts of where they were going conflicted; and (4) neither Defendant owned the vehicle or knew who did. Docs. 61-4 at 0:25-4:25; 64 at 39:18-22, 42:18-43:21. All of this was part of the traffic stop, not drug interdiction efforts. Certainly these facts led to suspicions, which understandably led the officers to ask for consent to search the vehicle and to deploy Jazz, but that does not mean the traffic stop had concluded. In short, the traffic stop did not "immediately turn into a drug investigation" before Jazz was deployed.

Nonetheless, in support of their argument that the traffic stop was "ersatz," the Defendants point to the absence of a traffic citation and of "any attempt to ascertain the status of the registration and ownership of the vehicle and the status of the driver's license."[9] Docs. 32 at 4; 66 at 8. But none of those things had yet happened here because the drugs were discovered so early in the stop. Moreover, because the officers quickly learned facts that led to further questions, they did not have time to do the things that they perhaps would have done in a routine traffic stop before the drugs were discovered. *See United States v. Boyce*, 351 F.3d 1102, 1106-07 (11th Cir. 2003) (noting that generally a traffic violation investigation is complete and the driver is free to go when all computer background checks have been performed, the traffic citation is issued, and the driver's license is returned).

---

[9] Also in support of his argument that the "true purpose of the stop" was to conduct a drug investigation, Constanza points out in his supplemental brief the following portion of Thompson's testimony: "After I determined [Cedano] was in violation [of the limited permit], there was nothing more to investigate." Docs. 64 at 41:2-3; 66 at 8. However, that does not mean, and Thompson did not say, the traffic stop was over. Because Thompson knew Cedano had improperly changed lanes and was driving without a proper license, he had nothing further to *investigate*. But Thompson had not yet done the things necessary to complete the traffic stop, most notably issuing traffic citations and arranging for the vehicle to be towed. Again, at four minutes into the stop, this traffic stop was nowhere near complete.

That leads to a significant point. If this had been a routine traffic stop of a properly-licensed driver in a vehicle registered to him, Thompson could have still constitutionally deployed Jazz four minutes into that stop, as was done here. While the Court acknowledges that the length of the stop may not always be determinative, the Eleventh Circuit has expressly held that a fourteen-minute traffic stop is not unreasonable and noted that stops much longer have been approved. *United States v. Purcell*, 236 F.3d 1274, 1279 (11th Cir. 2001) ("Fourteen minutes is not an unreasonable amount of time for a traffic stop. We have approved traffic stops of much longer duration.") (citations omitted). Thus, given that only four minutes had passed when Jazz was deployed, it is clear the officers, when they conducted the twenty-two second dog sniff, "did not prolong the traffic stop beyond a reasonable amount of time under the circumstances of the stop." *Id.* And because the dog sniff did not unreasonably prolong the traffic stop, the dog sniff is not a search subject to the Fourth Amendment and need not be supported by reasonable suspicion.[10] *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)).

In sum, the traffic stop had not concluded when Jazz, who was already present at the scene, sniffed the vehicle four minutes into the traffic stop and alerted. And when Jazz indicated there were drugs inside the vehicle, that gave the officers probable cause to search the vehicle. *United States v. Tamari*, 454 F.3d 1259, 1264-65 (11th Cir. 2006) (holding that the officers had probable cause to search the vehicle once the narcotics detection dog alerted them to the presence of narcotics in the rear of the vehicle). Accordingly, the Defendants' motions to suppress (Docs. 32; 60) are **DENIED**.

---

[10] The Court, however, reiterates that the officers' suspicions were based on more than "nervous indicators," giving rise to the level of reasonable suspicion to conduct the dog sniff.

**C.     Inevitable Discovery**

Though the Government never raises the argument, the drugs found in the vehicle would have been otherwise admissible under the inevitable discovery exception to the exclusionary rule. "Under the inevitable discovery exception, if the [government] can establish by a preponderance of the evidence that the information would have ultimately been recovered by lawful means, the evidence will be admissible." *United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (citation omitted). The Government must also show that "the lawful means which made discovery inevitable were being *actively pursued* prior to the occurrence of the illegal conduct." *Id.* (quotation marks and citation omitted).

Here, the officers actively pursued a lawful traffic stop. They asked for the Defendants' driver's license and determined neither Defendant could drive the vehicle— Cedano was in violation of his limited permit and Constanza had a suspended license. Thompson testified that "if there is not another licensed driver that can take the vehicle at that time," his department's policy requires him to do an inventory search before the vehicle is impounded by the wrecker. Doc. 64 at 23:19-24. Thus, even absent Jazz's alert or even assuming the dog sniff was somehow improper, the vehicle would have been impounded, an inventory search would have been conducted, and even the most cursory inventory search would have discovered the casually concealed drugs in the vehicle.

It would have been preferable that the Government introduce more evidence of the Lamar County Sheriff's Office's inventory search policy, especially given that the Government has the burden to provide evidence of that policy so that the Court could

determine whether the search was conducted pursuant to that policy or whether, if an officer exercised discretion to deviate from that policy, his decision to do so was reasonable under the particular facts and circumstances. *See Wells*, 495 U.S. at 4-5 (ruling that, absent an inventory search policy, the search at issue "was not sufficiently regulated to satisfy the Fourth Amendment and that [evidence found therefrom] was properly suppressed"); *see also Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992) ("Because an inventory search is an exception to the Fourth Amendment's warrant requirement, [. . .] the government [] has the burden to show that the requirements of the inventory search exception have been met."); *United States v. Laing*, 708 F.2d 1568, 1571 (11th Cir. 1983) ("As always, the reasonableness of the inventory search depends on the particular facts and circumstances."). However, given that the vehicle clearly had to be towed and impounded because there was no licensed driver to drive the vehicle from the scene and because the drugs were simply placed, partially, under the driver's seat, the Court easily concludes, even in the absence of more details about the inventory search policy, that an appropriate inventory search would have inevitably led to the discovery of the drugs. Accordingly, the Court finds in the alternative that the suspected methamphetamine found in the vehicle is admissible under the inevitable discovery doctrine.[11]

---

[11] Liberally construed, the Defendants' motions seek to suppress evidence of the hidden compartment behind the bumper, but the parties say little about that. The Defendants simply assert that the inventory search was improper because the officers "were looking to discover potentially incriminating evidence" against them. Doc. 60 at 4. The Government has tendered no evidence of the Lamar County Sheriff's Office's inventory search policy. Given that the general purpose of an inventory search is, as the name suggests, to keep an inventory of the items inside the vehicle, the Court cannot conclude, without the policy, that searching *outside* of the vehicle behind the bumper was within the scope of the policy. *See South Dakota v. Opperman*, 428 U.S. 364, 372-73 (1976) (noting that inventory searches, when conducted pursuant to standard police procedures or policy but without a warrant, are reasonable under the Fourth Amendment and that standard inventories often include checking places that store documents of ownership and registration and valuables). Perhaps searching behind vehicle bumpers is permissible

- 14 -

## IV. CONCLUSION

For the foregoing reasons, the Defendants' motions to suppress (Docs. 32; 60) are **DENIED**.

**SO ORDERED**, this 15th day of June, 2018.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

under the policy, but the Government has failed to meet its burden of providing the policy upon which the officers based their inventory search to find the hidden compartment. Accordingly, the Court cannot conclude that the evidence of the hidden compartment is admissible under the inventory search exception.

The evidence of the hidden compartment is nonetheless admissible for the same reason the drugs are admissible—because the officers had probable cause to search the vehicle. Not only did Jazz's alert give the officers probable cause to search the vehicle, but, once they discovered the suspected methamphetamine, the officers certainly had probable cause to believe the vehicle contained other evidence of a crime. Thus, it was permissible for the officers to "conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) ("[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody.") (citation omitted).